# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

JEFFREY MORRIS, TARAS KICK,
REBECCA SALAWDEH and STACEY
ANTALEK, on Behalf of Themselves and All
Others Similarly Situated,,

                 Plaintiffs,

   vs.

CBS BROADCASTING, INC., CBS
CONSUMER PRODUCTS, PLANET TOYS,
INC., TOYS "R" US, INC., WALGREEN
CO. and HAMMACHER SCHLEMMER &
CO., INC.,

                 Defendants.

———————————————————— x

Civil Action No. 08-CV-0592(HB)

**AMENDED CLASS ACTION COMPLAINT**

<u>DEMAND FOR JURY TRIAL</u>



Plaintiffs ("Plaintiffs"), by and through their attorneys, bring this Class Action against Defendants Planet Toys, Inc. ("Planet Toys"); CBS Consumer Products; CBS Broadcasting, Inc.; Toys "R" Us., Inc.; Walgreen Co.; and Hammacher Schlemmer & Co., Inc. (collectively "Defendants"), on their own behalf and on behalf of a class consisting of all persons who, during the period of June 2004 to the present, purchased and/or acquired Toxic Toys (defined below) that were licensed, manufactured, sold, marketed, and/or distributed by Defendants ("Class"). Plaintiffs bring this nationwide class action for equitable, injunctive, declaratory, and monetary relief. Plaintiffs allege the following upon their own knowledge, or where there is no personal knowledge, upon information and belief and investigation of counsel:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332, as amended by the Class Action Fairness Act of 2005, because the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and is a class action in which some members of the Class are citizens of different states than the Defendants. *See* 28 U.S.C. §1332(d)(2)(A).

2.      This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367. This Court also has personal jurisdiction over the Defendants because they are authorized to do business, and do conduct business, in New York; they have specifically marketed and sold the Toxic Toys in New York; and have minimum contacts with New York and/or sufficiently avail themselves to the markets of this State through their manufacturing, distribution, promotion, sales, and marketing within this State to render the exercise of jurisdiction by this Court permissible.

3.      Venue in this District is proper pursuant to 28 U.S.C. §1391 because a substantial part of the events giving rise to the claims asserted herein occurred in this District, and Defendants are subject to personal jurisdiction in this District. Moreover, Defendants inhabit and/or may be found

in this District and the interstate trade and commerce described herein is and has been carried out in part within this District.

## NATURE OF ACTION

4.      On or about December 21, 2007, Planet Toys issued a "stop sale" on one of its toys, the CSI: Crime Scene Investigation™ Fingerprint Examination Kit ("CSI Exam Kit"), more than three weeks after publicly-released test results showed samples of the fingerprinting powder in the kits contained deadly asbestos, and only after Connecticut officials halted sales of the toy in the state. A few days later, on December 24, 2007, Planet Toys issued a "stop sale" on the CSI Crime Scene Investigation™ Field Kit ("CSI Field Kit") – under pressure from the non-profit organization that commissioned the testing of the CSI Exam Kit – because the CSI Field Kit contained the same fingerprinting powder.

5.      Due to the extremely hazardous nature of asbestos, federal agencies such as the EPA have banned and/or heavily regulated certain products containing asbestos since the 1970s. Until studies in the late 1970s began documenting the severe health risks related to asbestos exposure, asbestos was traditionally used in the manufacture of products including textiles, building materials, insulation and brake linings. Defendants' inclusion of asbestos in toys intended for children is reprehensible and served no legitimate function.

6.      Despite the well-known hazards of exposure to asbestos and the particular vulnerability of children to the serious adverse health effects caused thereby, Defendants have yet to announce a formal "recall" of the toxic toys. In fact, Planet Toys continues to deny that the toys in question contain asbestos, despite multiple laboratory tests showing otherwise.

7.      To date, Defendants have failed to issue any "stop sale" with respect to their CSI: Crime Scene Investigation™ Forensic Lab Kit ("CSI Lab Kit"), even though it also contains the

same white fingerprinting powder found to be tainted with asbestos as is contained in the CSI Exam Kit.

8.    As detailed below, Defendants licensed, manufactured, distributed, marketed and/or sold children's toys made in China containing a fingerprinting powder that tested positive for tremolite asbestos ("Toxic Toys"). These products include various toy kits based on the CBS television series "CSI: Crime Scene Investigation," known to date to include the CSI Exam Kit, CSI Field Kit and CSI Lab Kit.

9.    On November 28, 2007, the Asbestos Disease Awareness Organization ("ADAO") released findings that the CSI Exam Kit's white "fingerprint dusting powder" tested positive for the presence of tremolite asbestos, which is one of the most lethal forms of asbestos and is widely known to cause cancer and other potentially fatal diseases. In releasing the detailed results of their tests, ADAO revealed that tests of the white fingerprinting powder contained in three different sample CSI Exam Kits found concentrations of deadly tremolite as high as **seven percent**. Importantly, any exposure to this asbestos fiber can cause illness, even cancer.

10.    The Connecticut Consumer Protection Commissioner halted the sale of the CSI Exam Kit in the State after his agency's testing showed that the toy contained tremolite asbestos. In a press release dated December 19, 2007, the Commissioner stated: "Given the potential health hazards associated with any asbestos contact, we are removing the item from sale immediately, and are asking consumers to take swift measures to make sure their children aren't exposed to the product. *There is no 'safe' level of asbestos.*"

11.    A single exposure to tremolite may cause fatal mesothelioma or lung cancer which can develop much later in life. The use of the Toxic Toys exposes children to deadly tremolite, not just once, but time and time again. The Toxic Toys' directions instruct children playing with the toy

- 3 -

to get their faces close to and blow on the fingerprinting powder when dusting for fingerprints, thereby increasing the potential for airborne disbursal and inhalation of carcinogenic and potentially lethal asbestos fibers each time they play with the toy or in the area in which the powder has been spread. Further, children may place the powder in their mouths or lick their fingers after playing with the Toxic Toys and ingest the asbestos-tainted powder as well.

12.    Asbestos does not degrade and will persevere in the environment into which it is released, allowing nearly perpetual re-entrainment. Not only does the intended use of the powder contaminate the environment in which the Toxic Toys are used, including food, flooring, furniture and clothing, but it also causes re-suspension of the asbestos fibers into the breathing zones of all occupants of such environment and consequent inhalation of the asbestos fibers.

13.    Despite the public safety hazard posed by the toys, it was not until Christmas Eve – nearly a month *after* ADAO released its findings and at the very end of the holiday shopping season – when Planet Toys finally issued a "stop sale" announcement on its website concerning the CSI Exam Kit and CSI Field Kit.

14.    To date, Defendants, however, have still failed to issue any formal recall of these toys. Additionally, to date, Defendants have failed to issue any "stop sale" with respect to their CSI Lab Kit, even though it also contains the same white powder found to be contaminated with deadly asbestos. For a period of months, Defendants even failed to abide by the "stop sale" and continued to sell and distribute the deadly CSI Field Kit.

15.    There have been widely-publicized nationwide recalls in recent years of toys and other products made in China due to the presence of hazardous substances such as lead paint. Despite these warnings, Defendants failed to adequately monitor the design and manufacture of the Toxic Toys in China to ensure that they were safe for children. Similarly, Defendants failed to

adequately inspect the Toxic Toys when they were delivered to the United States from China. As a result, Defendants sold, or allowed toys to be sold, in the United States that contain lethal asbestos in the fingerprinting powder.

16.     By and through their corporate headquarters, Defendants marketed the Toxic Toys as safe and quality products that were appropriate as playthings for children, even though they were not. Defendants knew or should have known that children were likely to inhale or otherwise ingest the asbestos-contaminated fingerprinting powder and spread the powder throughout their homes.

17.     Defendants have placed and continue to place in the stream of commerce tens of thousands of Toxic Toys throughout the United States, thus potentially exposing tens of thousands of consumers, including children, to a serious risk of cancer and other diseases through the inhalation of asbestos.

18.     Despite the lethal nature of asbestos, and the knowledge thereof, Defendants have not warned consumers and the public about the risk of asbestos presented by the Toxic Toys, nor have they disclosed the dangers to children's health associated therewith. Instead, Defendants have disseminated, and continue to disseminate, false and misleading information to consumers regarding the risk of asbestos exposure presented by the Toxic Toys.

19.     As a result of Defendants' failure to use proper quality control measures and to exercise sufficient control over their operations in China, and their misrepresentations to the public regarding the safety of the Toxic Toys, Plaintiffs and the Class have been put at risk for serious health problems and potentially fatal mesothelioma, lung cancer, and asbestosis, which may not surface for decades. Plaintiffs and the Class, therefore, seek the damages and injunctive relief described below.

## PARTIES

**Plaintiffs**

20.    Plaintiff Stacey Antalek ("Plaintiff Antalek") is a resident of Wappinger Falls, New York. Plaintiff Antalek purchased a CSI Exam Kit through defendant Toys "R" Us in Poughkeepsie, New York during the 2006 Christmas shopping season for her eight year-old child. Plaintiff Antalek would not have purchased the CSI Exam Kit had she known that it may contain a lethal form of asbestos.

21.    Plaintiff Jeffrey Morris ("Plaintiff Morris") is a resident of Glen Carbon, Illinois. Plaintiff Morris purchased a CSI Exam Kit on or about December 20, 2007, at a Walgreen's store in Glen Carbon, Illinois for his child. Plaintiff Morris would not have purchased the CSI Exam Kit had he known that it may contain a lethal form of asbestos.

22.    Plaintiff Taras Kick ("Plaintiff Kick") is a resident of Los Angeles, California. Plaintiff Kick purchased a CSI Lab Kit through defendant Hammacher's online store on December 23, 2007, for his eight-year-old child. Plaintiff Kick would not have purchased the CSI Lab Kit had he known that it may contain a lethal form of asbestos.

23.    Plaintiff Rebecca Salawdeh ("Plaintiff Salawdeh") is a resident of Wauwatosa, Wisconsin. Plaintiff Salawdeh's child received the CSI Exam Kit on September 22, 2007, as a gift for her child's ninth birthday. Plaintiff Salawdeh would not have accepted the CSI Exam Kit had she known that it may contain a lethal form of asbestos.

**Defendants**

24.    Defendant Planet Toys, Inc. ("Planet Toys") is a Delaware corporation with its headquarters in New York. By and through its headquarters in New York, Planet Toys designs, manufactures, markets and sells a variety of licensed toy products throughout the United States and worldwide. Planet Toys' website states that it "is an international toy manufacturer specializing in

the development of a wide variety of children's products." During the Class Period, Planet Toys designed, manufactured, marketed, and sold the Toxic Toys, including, but not limited to, the CSI Exam Kit, CSI Field Kit and CSI Lab Kit.

25.     Defendant CBS Broadcasting, Inc. ("CBS Broadcasting"), one of the largest radio and television networks in the United States, is a wholly-owned subsidiary of CBS Corporation. CBS Broadcasting exists under the laws of the state of New York and is headquartered in New York, New York. CBS Broadcasting operates the CBS.com online store, which during the Class Period offered the Toxic Toys for sale. Additionally, CBS Broadcasting was a signatory to the licensing agreement with Planet Toys for the design, manufacture, advertisement, distribution and sale of the Toxic Toys based on the popular CBS show, CSI: Crime Scene Investigation.

26.     Defendant CBS Consumer Products, a unit of CBS Entertainment, manages worldwide licensing and merchandising for television brands and series from CBS, CBS Paramount Network Television, and CBS Television Distribution. CBS Consumer Products oversees the CBS Retail Store and online sales of programming merchandise, which during the Class Period offered the Toxic Toys for sale. Additionally, CBS Consumer Products was a signatory to the licensing agreement with Planet Toys for the design, manufacture, advertisement, distribution and sale of the Toxic Toys based on the popular CBS show, CSI: Crime Scene Investigation.

27.     Defendants CBS Broadcasting and CBS Consumer products are referred herein collectively as "CBS."

28.     Defendants Planet Toys, CBS Broadcasting, Inc., and CBS Consumer Products are referred herein collectively as the "Manufacturer Defendants."

29.     Defendant Toys "R" Us, Inc. ("Toys 'R' Us") is one of the leading retailers of children's toys and baby products in the United States. The Company is owned by an investment

- 7 -

group consisting of affiliates of Bain Capital Partners LLC, Kohlberg Kravis, Roberts & Co. (KKR), and Vornado Realty Trust (NYSE: VNO). Toys "R" Us operates four divisions: Toys "R" Us, U.S.; Toys "R" Us, International; Babies "R" Us and Babiesrus.com; and Toysrus.com. The company sells merchandise through approximately 850 toy stores in the U.S. as well as through its Internet sites. Toys "R" Us is a Delaware corporation with its principal executive offices in Wayne, New Jersey. Mattel, Fisher-Price and Toys "R" Us distributed and sold the Hazardous Toys through Toys "R" Us during the Class Period. During the Class Period, Toys "R" Us marketed and sold the Toxic Toys to Plaintiffs and Class members.

30.     Defendant Hammacher Schlemmer & Co., Inc. ("Hammacher") is a New York corporation with its headquarters in Illinois. Hammacher is a catalog, on-line, and in-store retailer specializing in unusual and innovative gadgets and toy products. In addition to its catalog, which accounts for up to 70% of its revenues, Hammacher sells its merchandise through www.Hammacher.com and a retail store in New York. During the Class Period Hammacher marketed and sold the Toxic Toys to Plaintiffs and Class members.

31.     Defendant Walgreen Co. ("Walgreens") is an Illinois corporation with its headquarters in Deerfield, Illinois. Walgreens is a Fortune 50 company, with over 6,000 locations nationwide that sell prescription and nonprescription drugs and general merchandise. During the Class Period Walgreens marketed and sold the Toxic Toys to Plaintiffs and Class members.

32.     Defendants Toys "R" Us, Hammacher, CBS and Walgreens are referred herein collectively as the "Retailer Defendants."

## FACTUAL ALLEGATIONS

I.    **Asbestos Is a Highly Hazardous Substance**

A.    **The Dangers of Asbestos Exposure to Children**

33.    It is well established in the scientific community that exposure to asbestos is hazardous to human health.  Federal agencies have studied the extreme risks associated with the presence of asbestos in consumer products since the 1970s.  As a result, under federal law, asbestos is considered a highly hazardous substance.

34.    Asbestos is a fibrous mineral that becomes highly dangerous to humans when inhaled or otherwise ingested.  The most important factor in determining whether a product containing asbestos will pose exposure risks is "how easily the material will release asbestos fibers, which can be inhaled or ingested and in that way initiated disease."  S. Rep. 96-710, at 4 (1980), reprinted in 1980 U.S.C.C.A.N. 1426, 1430.  When asbestos fibers become airborne, they can be inhaled deep into the lungs.  Many of these fibers are retained in the lungs for long periods of time, causing inflammation and disruption of cell division.  However, the effects may not become apparent for decades, sometimes 20 to 30 years after the first exposure.

35.    Children may be particularly vulnerable to environmentally-induced cancers and thus more vulnerable to exposure of asbestos.  *See* 20 U.S.C. §3601(a)(2).  Asbestos exposure poses increased risk among children "due to the earlier period of life at which they are exposed." S. Rep. 96-710, at 5.  Further, "children are particularly vulnerable to carcinogens because of their longer potential lifetime and their rapid rate of growth."  16 C.F.R. §1304.5.

36.    The Environmental Protection Agency ("EPA") has found that exposure to airborne asbestos can result in serious health risks as a result of the fibers that become embedded in lung tissue.  Three serious and potentially lethal asbestos health risks include asbestosis, lung cancer, and mesothelioma.  Asbestosis, caused by exposure to asbestos, causes considerable pain and breathing

difficulty. Mesothelioma, a form of cancer that occurs only as a result of asbestos exposure, has a mortality rate of close to 100%.

37.    Tremolite is one of the most lethal forms of asbestos, widely known to cause cancer and other potentially fatal diseases. Indeed, a single exposure to tremolite may cause fatal mesothelioma or lung cancer, which may not develop for years or even decades later.

38.    Congress has found that there is no safe level of asbestos exposure. *See* 20 U.S.C. §3601(a)(3). The Senate Report supporting the Asbestos School Hazard Detection and Control Act (20 U.S.C. §3601 *et. seq.*), details the risks associated with exposure to asbestos, stating: "[T]he overwhelming scientific and medical opinion is that *there is no threshold level below which exposure to asbestos can be considered safe*, and that any unnecessary exposure to asbestos above that normally found in the background air should be avoided." S. Rep. 96-710, at 5 (emphasis added).

39.    The Senate Report further explained: "[T]he extraordinary latency period of asbestos-related disease – from 30 to 40 years – makes it imperative that steps be taken immediately to prevent a high incidence of disease in the future." *Id.*

**B.    Federal and State Law Classify Asbestos as a Highly Hazardous Substance**

40.    Products containing asbestos are banned under the Federal Hazardous Substances Act ("FHSA"), 15 U.S.C. §§1261-1278. Under the FHSA, a hazardous substance is any substance, or mixture of substances, that is toxic. 15 U.S.C. §1261(f). A toxic substance is one that "has the capacity to produce personal injury or illness to man through ingestion, inhalation, or absorption. . . . ." *Id.* §1261(g). Asbestos capable of becoming airborne clearly fits within this definition.

41.    Under the FHSA, a toy or other article intended for use by children is a "banned hazardous substance" if it "is a hazardous substance, or bears or contains a hazardous substance in such a manner as to be susceptible of access by a child." *Id.* §1261(q)(1)(A).

42.    Due to its catastrophic health effects, asbestos is also classified as a known human carcinogen by state, federal, and international agencies. The EPA has classified asbestos as a toxic substance and a Category "A" human carcinogen, the highest cancer hazard classification for a substance. Similarly, the International Agency for Research on Cancer has classified asbestos as a Class 1 human carcinogen. More than 40 countries, including all members of the European Union, have banned asbestos, with a few exceptions for certain uses.

43.    Due to the extremely hazardous nature of asbestos, federal agencies such as the EPA have heavily regulated certain products containing asbestos for over three decades since the 1970s. Because asbestos has traditionally appeared in building and other industrial materials such as roofing materials, tile and packaging material, much of the federal regulatory scheme centers on these categories of products.

44.    In 1989, after conducting a ten-year study, the EPA banned and phased out most uses of asbestos pursuant to regulations promulgated pursuant to its authority under the Toxic Substances Control Act ("TSCA") (15 U.S.C. §2601 *et seq.*). In 1991 the Fifth Circuit overturned a portion of the regulations due primarily to the EPA's failure to follow certain statutory and administrative procedures; however, it left intact the ban of various papers, felt, and new uses of asbestos. *See* 40 C.F.R. §763.163; 58 F.R. 58964-01. Moreover, the court agreed with the EPA's overall determination that "asbestos is hazardous and presents risks throughout different industries." 58 FR 58964-01.

45.    On October 4, 2007, the Senate unanimously passed S.742, known as the Ban Asbestos in America Act of 2007 ("Ban Asbestos Act").  Congressional findings in the Ban Asbestos Act confirm the EPA's much earlier findings that there is no safe level of exposure to asbestos, and even low levels of exposure to asbestos may cause asbestos-related diseases, including mesothelioma.  Indeed, the Environmental Working Group estimates that as many as 10,000 U.S. citizens die each year from mesothelioma and other asbestos-related diseases.

46.    The Consumer Product Safety Commission ("CPSC"), pursuant to its authority under the Consumer Product Safety Act ("CPSA"), has held that it is "in the public interest to regulate the risk of cancer associated with the inhalation of asbestos fibers." 16 C.F.R. §1145.4.  The CPSC has banned consumer patching compounds and emberizing materials containing asbestos, including household products "sold in a dry form ready to be mixed with water." 16 C.F.R. §§1145.4, 1145.5, 1304.1, 1304.4, 1305.1, 1305.4.  The CPSC found that when asbestos fibers become airborne they present an unreasonable risk of injury due to the possibility of inhalation which increase the risk of developing cancer, including lung cancer and mesothelioma. *See* 16 C.F.R. §1304.2.  The CPSC specifically found "children are particularly vulnerable to carcinogens because of their longer potential lifetime and their rapid rate of growth." 16 C.F.R. §1304.5.

47.    Additionally, pursuant to the TSCA, the EPA has banned specific asbestos-containing products which "present an unreasonable risk of injury to health or the environment." *See* 15 U.S.C. §2601(a)(2).  The banned products include flooring felt, papers and "new uses" products, those that have not historically contained asbestos.  40 C.F.R. §§763.163; 763.165; 58 F.R. 58964-01.

48.    Certain states have also passed legislation regulating the use of asbestos. *See* e.g. Cal. Health & Safety Code §25249.5, *et seq*.  It is forbidden to "expose any individual to a chemical

known . . . to cause cancer . . . without first giving clear and reasonable warnings to such individual . . . ." Cal. Health & Safety Code §25249.6.

49.    Similarly under New York law, the legislature heavily regulates contractors working on asbestos projects, requiring proper licensing, training and education of workers. *See* N.Y. Labor Law §900. The legislature found that "exposure to asbestos fibers, a known carcinogenic agent, creates a serious risk to the public health and safety." *Id.*

**II.    Defendants Uniformly Misrepresented that the Toxic Toys Were "Safe"**

**A.    The Toxic Toys Mimic Popular Television Show: "CSI: Crime Scene Investigation"**

50.    "CSI: Crime Scene Investigation" is a popular television series airing on CBS that follows the investigations of forensic scientists as they uncover the circumstances of mysterious crimes. In addition to the original series, which is now in its eighth season, there are two spin-offs: CSI: Miami and CSI: New York. The CSI shows air in 200 countries to audiences of over two billion people. Each week, approximately 60 million Americans tune in to watch the CSI shows. Due to the shows' immense popularity, CSI consumer products have wide brand recognition. Moreover, consumers trust that the CBS brand is used only on quality products.

51.    In 2004, Planet Toys entered into a licensing agreement with defendant CBS to produce a line of CSI: Crime Scene Investigation™ forensic activity kits targeted at CSI's younger audience. As a part of this line and in accordance with the licensing agreement, Planet Toys produced each of the Toxic Toy products at issue, including the CSI Exam Kit, CSI Field Kit, and CSI Lab Kit. Under the licensing agreement CBS oversees the production, design and distribution of its licensed products, including the Toxic Toys at issue. Additionally, CBS profits from the individual sales of the Toxic Toys. Moreover, during the relevant time period, the Toxic Toys were available for purchase at CBS' online store.

- 13 -

52.    Under the licensing agreement, CBS is charged with pre and post-manufacturing approval of the toys, as well as approval of any packaging, advertising and publicity. Additionally, CBS maintains the right to access Planet Toys' inventory and take a sampling of toys without advance notice.

53.    The Toxic Toys manufactured and distributed by Planet Toys mimic the types of tools used by the characters appearing on the CSI television series. For example, Planet Toys encourages young users of the CSI Exam Kit to "[c]ollect, examine and record fingerprints with Grissom's CSI team!" Gil Grissom is a popular lead character of CSI: Crime Scene Investigation.

54.    Each of the Toxic Toys contains instructions and the necessary tools to replicate investigations like those on CSI: Crime Scene Investigation. For example, the CSI Exam Kit contains a fingerprinting brush, fingerprinting powder, specimen tweezers, fingerprint stamps, an ink pad, magnifying glass, crime scene notebook, gloves, evidence bags, and fingerprint identification cards. The instructions contained in the box direct the child to blow the fingerprinting powder, stating: "Now Try What The Pros Do!" The instructions tell the child to: "Open the vial of fingerprint powder. *Shake out* a very small amount of the fingerprint powder, smaller than a dime, next to the fingerprint . . . . *Brush softly and lightly* until every detail of the print is clear. The two common mistakes are brushing too hard & not brushing enough. When you have finished brushing, *blow lightly across the print* to remove the excess powder." (Emphasis added.)

55.    Because the children are actually instructed to blow the asbestos-tainted powder after brushing for fingerprints, it is very likely that children playing with this toy will inhale potentially lethal asbestos fibers. Moreover, the powder is intended to be spread all over the house by children searching for fingerprints, thus making asbestos exposure for household members all the more likely.

**B.    Defendants Falsely Warranted that the Toxic Toys Were Safe, Quality Products that Families Could Trust and Appropriate for Children of Certain Ages**

56.    Planet Toys markets and advertises to consumers that their toys are safe as playthings for children.  Planet Toys describes itself as "an international toy manufacturer specializing in the development of a wide variety of children's products."  Its marketing campaign touts the "top notch" quality of its products.  Indeed, on its website, Planet Toys explains:

> Planet Toys' products are designed by a top notch, creative and innovative in house design team. . . .  Our engineers are hands on through all phases of production to insure the best product is shipped to our customers.  The goal of Planet Toys is to develop, produce and deliver innovative, unique and fun products for children around the world to enjoy over and over again.

57.    Additionally, Planet Toys' motto is "The highest standards of excellence in dealing with our retailers, manufacturers and licensors. . . ."

58.    Planet Toys also prides itself "on high quality and *good performing* products in order to obtain 100% customer satisfaction."

59.    Further, the packaging on the Toxic Toys indicates these toys are safe and appropriate for children aged 10 years and older.  Thus, Planet Toys specifically represented that the Toxic Toys are appropriate for children of a certain age, and that they were safe if used properly, especially if under adult supervision.

60.    Notably, age grading practices are important to ensure that a toy is appropriate and safe at particular stages of children's physical and mental development.  In its packaging of toys and elsewhere, Planet Toys represented that the toys were appropriate for certain ages of children.  In doing so, Planet Toys gave Plaintiffs and members of the Class the false impression that their toys were safe for use by children of those ages, when in fact, they were harmful to persons of any age.  Plaintiffs and members of the Class were led to believe that the Toxic Toys were appropriate for use by children to play with as children normally do.

- 15 -

61.    The Retailer Defendants further enabled the Manufacturer Defendants to make representations concerning the quality of the toys.  The retailers that sold the Toxic Toys adopted, and are responsible for, the representations of the Manufacturer Defendants on the packaging of the Toxic Toys regarding the safety of the toys and the age appropriateness of the toys, when they decided to sell such toys to Plaintiffs and members of the Class.

62.    Additionally, the Retailer Defendants have made representations to customers that the toys they sell are safe products.

63.    Hammacher represents on its website that: "The Hammacher Schlemmer Institute is a not-for-profit corporation established . . . to research, test and rate products objectively and without commercial bias.  The Institute regularly tests products to help customers make informed buying decisions."

64.    Hammacher also represents that it uses "independent testing laboratories" which utilize "specialized, calibrated equipment not readily available anywhere else" to test the merchandise.

65.    Hammacher also specifically represents that the Toxic Toys are safe.  In Hammacher's description for the CSI Lab Kit, Hammacher states: "The manufacturer has confirmed that this item meets *all* U.S. Federal toy safety standards, including safety standards for lead."

66.    Likewise, Toys "R" Us represents that its toys are safe for children.  On its website, Toys "R" us lists the following question and answer:

> **Are all the toys carried by Toys "R" Us tested for hazards and what are they tested for?**  We have a very strict safety assurance program for all the products we carry.  We require that any products we purchase (including from outside the United States) comply with all applicable government and industry laws, codes and requirements.  We have mandated that our manufacturers test every toy shipment to Toys "R" Us before it leaves the country of origin for a variety of potential safety concerns including lead, small parts, sharp edges, flammability and other mechanical hazards.

**How can you ensure the toys in your stores are safe for customers to purchase?**
As the world's largest specialty toy retailer, we know that nothing is more important than the safety of children. Toys "R" Us safety standards require that our products meet or exceed federally mandated and industry-accepted standards."

67.     Contrary to Defendants' representations, the Toxic Toys were not in fact safe or age appropriate because they contained deadly asbestos. Plaintiffs and members of the Class were deceived by Defendants' representations and would not have purchased and/or accepted as gifts the Toxic Toys had they known of the asbestos contamination.

### C.     Defendants Continued to Market and Sell the Toxic Toys During the 2007 Holiday Season, Even After Reports of Asbestos

68.     On November 27, 2007, the Seattle Post-Intelligencer published an article reporting that hazardous asbestos had been found in a number of consumer products, including the Toxic Toys. The article revealed that the CSI Exam Kit created the greatest concern to public health experts because it was a "huge seller." The article went on to explain:

Physicians are especially concerned because of the significant likelihood of children breathing in asbestos fibers as they hunt for fingerprints and use a soft-bristled brush to move the powder around.

69.     A day later, ADAO issued a press release announcing its findings that the CSI Exam Kit's white "fingerprint dusting powder" tested positive for the presence of tremolite asbestos, which is one of the most lethal forms of asbestos and is widely known to cause cancer and other potentially fatal diseases. In releasing the detailed results of their tests, ADAO revealed that tests of the white fingerprinting powder contained in three different samples of the CSI Exam Kits found concentrations of deadly tremolite as high as seven percent.

70.     **Even after** ADAO's press release and the Seattle Post Article, Planet Toys continued to deny that the Toxic Toys posed a safety hazard to consumers. On December 3, 2007, Planet Toys issued a statement on their website in response to the Seattle Post article discussing ADAO's discovery of asbestos in the Toxic Toys:

While the Asbestos Disease Awareness Organization alleged that two of the three powders contained an asbestos content of 5%, Planet Toys test – conducted by a leading asbestos testing laboratory in upstate New York – concluded that there was NO asbestos detected in any of our kits tested. Planet Toys is both proud and pleased to announce our findings in refuting the asbestos organization's claim.

71.     Although Planet Toys and CBS were fully aware of the positive test results that ADAO published with respect to the Toxic Toys, they failed to contact ADAO to discuss its findings and continued to market and encourage the purchase of the Toxic Toys during the busy holiday season. Indeed, in its December 3, 2007 statement Planet Toys affirmed: "We are also happy to report our CSI Fingerprint Exam kits, and the rest of the CSI kits pictured here on our website, are available at your local retailer."

72.     Despite its access to international television, radio, and Internet media, CBS failed to make any timely public statements acknowledging that ADAO had found deadly asbestos in the toys at issue or informing its consumers of the dangers associated with the Toxic Toys. CBS also failed to take timely action in informing retailers that the Toxic Toys had tested positive for deadly asbestos or instructing them to remove the Toxic Toys from retail shelves and their websites. Indeed, CBS and Planet Toys jointly conducted safety tests on the Toxic Toys and had the ability to demand that Planet Toys pull the Toxic Toys from store shelves. But because CBS did not adequately test or take adequate quality control measure with respect to its licensed toys and did not promptly demand the asbestos-positive Toxic Toys be removed from shelves, Plaintiffs and members of the Class were, and continue to be, needlessly exposed to fatal asbestos.

73.     As a result of Defendants' misrepresentations and dissemination of misleading information in the face of evidence that the Toxic Toys contained asbestos, Plaintiffs and members of the Class purchased or acquired the Toxic Toys believing that the toys were safe for children to play with according to the toy's instructions, and reasonably believed that the fingerprinting powder

- 18 -

which was spread and blown around children, other members of their households, and bystanders would not be at risk of inhaling carcinogenic and potentially lethal asbestos fibers.

### III.    Defendants Knew the Toxic Toys Were at Risk for Asbestos

74.    Although asbestos has been banned from many products for over 18 years including those intended for use by children in the United States, Defendants licensed, manufactured, marketed, distributed and sold the Toxic Toys made in China even though they contained tremolite, a deadly form of asbestos.  Further, despite positive asbestos test results that were released publicly and numerous recalls in recent years of Chinese-made toys, Defendants' activities in this regard have not completely ceased.

75.    ADAO is a nonprofit advocacy organization for asbestos victims that, as previously mentioned, published detailed results of laboratory tests on November 28, 2007.  ADAO had conducted testing on a variety of common household products and toys, including the CSI Exam Kit. The five-month research study led by Scientific Analytical Institute, Inc. ("SAI") examined more than 250 suspect products acquired from national retailers.  As stated in the ADAO November 28, 2007 press release:

> Samples were drawn from diverse areas, including . . . children's toys.  Confirmation testing was conducted by two independent laboratories, MVA Scientific Consultants, Inc., and Bureau Veritas North American, Inc.  Samples were analyzed for asbestos following the analytical procedures described in the U.S. Environmental Protection Agency "Test Method EPA/600/R-93/116: Method for the Determination of Asbestos in Bulk Building Materials."  The samples were examined by Polarized Light Microscopy (PLM) and by Transmission Electron Microscopy (TEM), at magnifications from 100 to 50,000 times.

76.    The SAI purchased a CSI Exam Kit from Toys "R" Us on June 7, 2007.  SAI tested all five fingerprinting powders present in the kit.  SAI found the most deadly form of asbestos – tremolite – in the white fingerprinting powder contained in the CSI Exam Kit.  Further analysis revealed the concentration of asbestos in the powder was 7.24%.

77.    SAI purchased a second CSI Exam Kit on June 28, 2007, from Toys "R" Us to confirm the reliability of the first test results. Tremolite was again found in the white fingerprinting powder. Further analysis revealed that the concentration of tremolite in this sample was between 0.69% and 5.63%.

78.    In July 2007, SAI purchased and tested another CSI Exam Kit. The tests found a concentration of 0.05% tremolite.

79.    ADAO revealed the SAI's findings of asbestos in the CSI Exam Kits on November 27, 2007, in the Seattle Post Article.

80.    In the Seattle Post Article, Planet Toys admitted that it had performed inadequate inspections on its manufacturing plants in China and had never tested any of its children's products for asbestos. As was reported in the article:

> The manufacturer and distributor [of the Fingerprint Examination Kit] – Planet Toys in New York City – said in an e-mail that it frequently inspects the plants in China that make the CSI toys. "The kit has been tested and has met all safety standards requirements as set by toy safety agencies and legislation, including the Consumer Product Safety Commission," a spokeswoman said, but added, "The agencies don't require asbestos testing and therefore we have never been apprised of any unacceptable levels of asbestos."

81.    Following ADAO's public release of the test results, U.S. Senator Patty Murray wrote to several of the defendants, urging them to terminate sales of the CSI Exam Kit and emphasizing that "[a] single exposure to tremolite is sufficient to cause fatal mesothelioma or lung cancer later in life."

82.    The ADAO test results also sparked action by the Connecticut Department of Consumer Protection ("DCP"). On December 19, 2007, the DCP issued a press release regarding the CSI Exam Kits, in which it announced a recall and embargo of the product at all retailers statewide and told consumers to return the product to retailers for a refund or store credit. The DCP also encouraged any consumer not satisfied with retailer response to file a complaint. DCP-

commissioned testing confirmed the presence of asbestos in the white fingerprint powder in the CSI Exam Kit.

83.     In its press release, the DCP stated: "Given the potential health hazards associated with any asbestos contact, we are removing the item from sale immediately, and are asking consumers to take swift measures to make sure their children aren't exposed to the product. There is no 'safe' level of asbestos."

84.     ADAO continued its testing after its public release of its findings on the CSI Exam Kit. In all, of nine kits tested, five were found to contain tremolite asbestos. All of these test results were shared with Planet Toys and CBS.

85.     Defendants were clearly aware that the Toxic Toys contained asbestos no later than November 27, 2007, when the Seattle Post Article was printed, yet they failed to take action to adequately protect consumers from exposure to the deadly tremolite.

86.     Furthermore, because China is the second largest producer of asbestos in the world, asbestos contamination of Chinese-made products was likely.

87.     Additionally, Defendants knew or should have known that talc – the principal ingredient of the fingerprinting powder – is commonly contaminated with asbestos because the natural conditions that create talc also create asbestos. As such, talc is no longer used in most consumer products. Defendants specified that talc be used or allowed talc to be used to make white fingerprinting powder marketed for children even though they knew or should have known of the likelihood that the talc would be contaminated with asbestos. Further, Defendants knew or should have known that the use of talc in the CSI products would require quality control standards to ensure it was not contaminated with tremolite asbestos. However, Defendants failed to take sufficient

quality control measures to ensure that the mining and milling of the talc in China, to be used in the Toxic Toys, did not incorporate mineral asbestos.

88.    Planet Toys was aware of the risks associated with manufacturing toys with talc but failed to put proper controls on its manufacturing operations in China to adequately screen products delivered from China to ensure that products were safe for consumers prior to placing them into the stream of commerce.

89.    Given the toxicity of asbestos and that it can be found in talc, defendants should have implemented much more stringent testing and quality control standards to prevent the sale and marketing of toys contaminated with asbestos in the United States.

90.    In fact, a representative of Planet Toys *admitted that the company never tested its products for deadly asbestos*.  According to the Seattle Post Article, the company spokeswoman stated: "The [safety] agencies don't require asbestos testing and therefore we have never been apprised of any unacceptable levels of asbestos."  Notably, asbestos is remarkably easy to detect through the use of Polarized light microscopy ("PLM").  PLM uses specialized microscopes that are able to establish the percentage and type of asbestos present in the product.  This process is relatively inexpensive and remains the most accurate instrument for determination of minerals, including asbestos.  *See* 29 C.F.R. §1910.  Despite all the known dangers of Chinese-made toys and the association between talc and asbestos, Defendants failed to inspect the Toxic Toys for deadly tremolite.

**IV.    Defendants Continue to Sell and Uniformly Mislead Consumers as to the Dangers of the Toxic Toys**

91.    Despite the catastrophic health effects that exposure to tremolite can cause, and despite their knowledge that the Toxic Toys have *repeatedly* tested positive for deadly tremolite,

Defendants have neither publicly warned consumers of the dangers of their children playing with the toys nor have they issued a formal recall.

92.    Indeed, even after ADAO published its comprehensive study revealing the Toxic Toys were contaminated with deadly asbestos, none of the Defendants took steps to contact ADAO about its test results. Only after ADAO, through counsel, sent a letter on December 14, 2007, to some Defendants demanding a meeting did Planet Toys and CBS communicate with ADAO about its test results.

93.    Following a meeting with ADAO on December 18, 2007, Planet Toys sent letters to retailers on December 21, 2007, asking that they stop the sale of the CSI Exam Kit. Such retailers included Wal-Mart, Walgreens, Toys "R" Us, Blain Supply, Inc., Boscovs Department Stores, eToys, Direct, Inc., Mills Fleet Farm and MPA.

94.    On December 24, 2007, Planet Toys issued a "stop sale" for the CSI Exam Kit and the CSI Field Kit on its website. It stated in relevant part: "[P]lanet Toys is temporarily issuing a voluntary 'stop sale' on the Kits while it conducts further investigation. During this process we ask that all retailers take appropriate steps, remove the Kits from the shelves immediately and separate the removed inventory for further action."

95.    However, to date, Defendants have neither issued a formal recall of Class members of the Toxic Toys, nor attempted to provide any detailed warning to consumers, regarding the extremely hazardous nature of the Toys or the deadly asbestos that may be contained therein. Additionally, Defendants have not issued a "stop sale" with regard to other Toxic Toys containing the fingerprinting powder, such as, the CSI Lab Kit. As is stated on various retailer websites, including those of Amazon.com, Sears Roebuck, Etoys, and BabyUniverse.com, the CSI Lab Kit includes "[e]verything a young investigator needs to solve the case . . . such as a microscope and

- 23 -

*fingerprinting kit* – just like the one used in the field." *See* http://www.amazon.com (search "CSI Forensic Lab").

96.    Planet Toys has continued to represent to consumers that the CSI Lab Kits are safe and appropriate for children's use. In fact, in its December 24, 2007, "stop sale" statement concerning the CSI Exam and CSI Field Kits, Planet Toys reiterated: "We note that no other Planet Toys products, including other CSI-branded products, are affected by this stop sale order."

97.    As such, Plaintiffs and members of the Class continue to purchase and/or acquire the CSI Lab Kit, which was never pulled from store shelves and websites, even though they contain the same white fingerprinting powder that is found in the CSI Exam Kit that has repeatedly tested positive for tremolite by multiple sources.

98.    Additionally, Planet Toys has failed to exercise adequate control over the retailers, including the Retailer Defendants, to ensure that they executed the "stop sale" issued by Planet Toys on December 21 and 24, 2007. Retailers continued to sell the CSI Exam Kit and CSI Field Kit for an unknown period of time after the "stop sales" were issued, continuing to put consumers at risk of harm from potentially lethal asbestos fibers. For example, as of May 23, 2008, Amazon.com continues to sell the CSI Field Kit subject to the "stop sale." *See, e.g.,* http://amazon.com (search "CSI Field Kit").

99.    As of April 4, 2008 the CSI Lab Kit was still available for purchase through various retail websites, including Amazon.com, Etoys, defendant Hammacher, Speedydog and Sears. Thus, members of the Class continue to purchase and/or acquire the Toxic Toys *without any warning* and thereby unknowingly expose themselves and bystanders to potentially fatal asbestos.

100.    The Retailer Defendants have not issued any statements to consumers either on websites or in their retail stores regarding the potential contamination of the Toxic Toys or the "stop

sale" orders issued by Planet Toys. At most, the Retailer Defendants merely post a "sold out" or "out of stock" message to consumers when they attempt to purchase the CSI Exam and CSI Field Kits. However, as aforementioned, some retailers, such as Amazon.com continue to unabashedly sell the Toxic Toys.

101.    Additionally, CBS has failed to issue any public statements on its website or through any of its readily-accessible national media outlets regarding ADAO's positive asbestos test results, the DCP recall, or any other information relevant to the danger of the Toxic Toys or asbestos contamination for children and their families. CBS also failed to timely exercise its powers under the licensing agreement with Planet Toys and take possession of a sampling of toys for its own independent testing.

102.    Defendants have also failed to provide any information to Plaintiffs or members of the Class concerning how to safely dispose of the Toxic Toys once they become aware of their possible asbestos contamination. Plaintiffs, members of the Class and bystanders continue to be put at risk of exposure to potentially lethal asbestos as a result of Defendants' continued failure to provide adequate information to the public concerning the hazardous nature of the Toxic Toys and of asbestos exposure.

103.    To the contrary, Planet Toys has continued to deceive consumers regarding the safety of the Toxic Toys and the presence of asbestos in the fingerprinting powder. As of January 15, 2008, Planet Toys continued to represent on its website that the Toxic Toys were not contaminated with asbestos, despite the existence of multiple laboratory tests showing otherwise. Planet Toys defended its products stating that, in addition to its own independent testing, "two prominent retailers" conducted tests and found no asbestos in their sample products. At the same time, Planet Toys has failed to acknowledge that other sources have tested the products positive for asbestos

contamination. Additionally, Planet Toys has failed to provide any explanation for the findings of ADAO and DCP that the fingerprinting powder in fact contains deadly asbestos.

104.    Plaintiffs and members of the Class have purchased and/or acquired and continue to purchase and/or acquire the Toxic Toys based on Defendants' representations that the toys are safe for their children as playthings. Plaintiffs and members of the Class were and continue to be deceived by Defendants' representations, and they would not have purchased or acquired the Toxic Toys if they had known of the asbestos contamination.

**V.    Children Must Be Immediately Assessed for Asbestos Exposure**

105.    It is a terrifying fact for parents whose children received a Toxic Toy contaminated with asbestos that asbestos is not visible to the naked eye and that asbestos-related symptoms and/or disease may not appear for years, even decades, after the initial exposure. According to the California Office of Environmental Health Hazard Assessment: *"[I]nhalation of asbestos fibers can initiate a chain of events resulting in cancer or other asbestos-related illness, which may not become apparent for years, even long after the exposure has ended."*

106.    Early assessment of exposure is the most important action that parents can take in determining whether their child is at risk for future asbestos-related health problems. The Department of Health and Human Services ("DHHS") recommends that any person potentially exposed to asbestos should immediately minimize or avoid further exposure to the asbestos and seek medical care.

107.    It is beyond dispute that early detection of exposure to asbestos is critical. It is thus necessary to make an immediate assessment of whether Plaintiffs and members of the Class may have been exposed to the asbestos. This can be done by testing the Toxic Toys that have been used in American households for the presence of asbestos fibers. Polarized light microscopy ("PLM") is the asbestos testing method set out by the EPA and the Occupational Safety and Health

Administration ("OSHA"). *See* 29 C.F.R. §1910.1001. This requires the use of specialized microscopes that establish the percentage and type of asbestos present in the sampled material. *See* 29 C.F.R. §1910.

108.    If a child has played with one of the Toxic Toys which tests positive for asbestos, the child is at risk of developing cancer and other asbestos-related diseases in the extended future. Accordingly, another component of early assessment is a review of the medical and environmental history by a medical professional of any child who has been exposed to a contaminated toy to determine the child's risk of future disease.

109.    Healthcare providers are able to identify and monitor the potential for asbestos-related disease by reviewing one's medical history and environmental history. Through this assessment and continued medical care, physicians are able to consider whether vaccines, such as influenza or pneumonia, are appropriate. Further, physicians can establish baseline long physiology and radiologic appearance so that significant changes can be immediately detected and reasonably monitored.

110.    However, some putative Class members cannot afford the toy testing and medical assessment of their children. Even though they may be extremely distressed about their children possibly being exposed to the asbestos in the Toxic Toys and the possible adverse health effects that are associated therewith, they simply do not have the financial resources to pay for the testing and assessment.

## CLASS ACTION ALLEGATIONS

111.    Plaintiffs bring this nationwide class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. Plaintiffs bring this action on behalf of themselves and all others similarly situated, including a nationwide class comprised of all persons who, during the period of June 2004

to the present, purchased and/or acquired Toxic Toys that were licensed, manufactured, sold, marketed, and/or distributed by Defendants.

112.    The Class is so numerous that joinder of all members is impracticable. According to publicly available information, it appears that the total membership of the Class numbers is in the thousands.

113.    There are many common questions of law and fact involving and affecting the parties to be represented. These common questions of law or fact predominate over any questions affecting only individual members of the Class. Common questions include, but are not limited to, the following:

(a)    Whether Defendants negligently and/or fraudulently or recklessly licensed, manufactured, distributed, marketed, tested and/or sold the Toxic Toys;

(b)    Whether the Toxic Toys are defective;

(c)    Whether Defendants conducted adequate studies and quality tests of their Toxic Toys to determine whether and to what extent the Toxic Toys were contaminated with asbestos and thus unsafe;

(d)    Whether Defendants engaged in deceptive and unfair business and trade practices;

(e)    Whether Defendants knowingly or negligently concealed or omitted material information concerning the safety of the Toxic Toys;

(f)    Whether the Class has been injured by virtue of Defendants' negligence, carelessness, and/or deceptive business practices and conduct; and

(g)    Whether Defendants misrepresented the safety of the Toxic Toys.

114.    Plaintiffs' claims are typical of the claims of the respective Class they seek to represent, in that the named Plaintiffs and all members of the proposed Class or their households have purchased and/or acquired Toxic Toys.

115.    Plaintiffs will fairly and adequately protect the interests of the Class, and have retained attorneys experienced in class actions and complex litigation as their counsel.

116.    Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief.

117.    Plaintiffs aver that the prerequisites for class action treatment apply to this action and that questions of law or fact common to the Class predominate over any questions affecting only individual members and that class action treatment is superior to other available methods for the fair and efficient adjudication of the controversy which is the subject of this action.  Plaintiffs further state that the interests of judicial economy will be served by concentrating litigation concerning these claims in this Court, and that the management of this Class will not be difficult.

## COUNT I

### Negligence – Design/Manufacturing Defect or Failure to Warn
### (On Behalf of All Plaintiffs Against All Defendants)

118.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

119.    Defendants designed, manufactured, promoted, licensed, sold and/or distributed the Toxic Toys to parents of children.

120.    Defendants had a duty to exercise reasonable care in the design, manufacture, promotion, license, sale and/or distribution of the Toxic Toys, including a duty to assure that the Toxic Toys were not contaminated with potentially lethal asbestos.

- 29 -

121.    Defendants failed to exercise reasonable care in the design, manufacture, promotion, license, sale and/or distribution of the Toxic Toys.

122.    Specifically, Defendants were negligent in their design, manufacture, promotion, license, sale and/or distribution of the Toxic Toys in that they:

(a)    failed to use reasonable care in designing, licensing, manufacturing, and selling the Toxic Toys so as to ensure that they were not contaminated with asbestos;

(b)    failed to conduct adequate quality testing or inspection of the Toxic Toys in China, upon their arrival in the United States, or at any time prior to sale, to determine the safety of the Toxic Toys;

(c)    failed to make adequate inquiry of the Manufacturer Defendants as to the safety of the Toxic Toys as to the Retailer Defendants; and/or

(d)    failed to accompany the Toxic Toys with proper warnings regarding the adverse effects associated with exposure to asbestos.

123.    Despite the fact that Defendants knew or should have known that the Toxic Toys were contaminated with asbestos and that they could cause adverse health effects to children, they continued to market and sell the Toxic Toys to consumers, including Plaintiffs and members of the Class. As both a licensor and retailer, CBS could have immediately imposed a "stop sale" of its own and/or rescinded its license agreement or the ability of Planet Toys to continue distributing, marketing, and selling the Toxic Toys, when it became or should have become aware of the presence of fatal asbestos. In addition, the Retailer Defendants should have immediately imposed a "stop sale" and warned Plaintiffs and the Class about the serious health risks associated with the Toxic Toys.

124.    Defendants knew or should have known that Plaintiffs and members of the Class would foreseeably suffer damages as a result of their failure to exercise reasonable care in the design, manufacture, license, promotion and sale of the Toxic Toys, including the value of the Toxic Toys, the cost of asbestos testing for each used toy in households, and, if contamination is found or the toy has been discarded, the expense of assessing children and household members for asbestos exposure and increased risk of adverse health effects.

125.    Defendants' negligence was a proximate cause of the damages suffered by Plaintiffs and members of the Class as previously set forth herein.

126.    Defendants also had a duty to exercise reasonable care in the design, manufacture, license, promotion, sale and/or distribution of the Toxic Toys, including a duty to warn that the Toxic Toys might be contaminated with asbestos.

127.    Defendants failed to exercise reasonable care in the design, manufacture, license, promotion, sale, and/or distribution, of the Toxic Toys in that they failed to provide proper warnings to consumers regarding the possible asbestos contamination in the fingerprinting powder in the Toxic Toys and the serious adverse health effects associated with children's exposure to asbestos.

128.    Defendants knew or should have known that Plaintiffs and members of the Class would foreseeably suffer damages as a result of their failure to provide warnings that the Toxic Toys may contain asbestos and the serious adverse heath effects associated with children's exposure to asbestos in the Toxic Toys, including the cost of asbestos testing for each used toy in households, and, if contamination is found or the toy has been discarded, the expense of assessing on an ongoing basis children and household members for asbestos exposure.

129.    Defendants' negligence was a proximate cause of the damages suffered by Plaintiffs and members of the Class as previously set forth herein.

- 31 -

130.    Plaintiffs do not allege negligence claims based on an injury to the Toxic Toys; Plaintiffs' negligence claims relate to injuries that they and Class members sustained as a result of the Toxic Toys.

## COUNT II

### Breach of Implied Warranty
### (On Behalf of Plaintiffs Against All Defendants)

131.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

132.    The Uniform Commercial Code §2-314 provides that, unless excluded or modified, a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind.

133.    Defendants manufactured, licensed, marketed and sold the Toxic Toys and represented that the Toxic Toys were fit for use by children.  In addition to selling the Toxic Toys at its online store, as licensor, CBS retained the rights to review and approve the Toxic Toys and consented to the distribution of the Toxic Toys.  Contrary to Defendants' representations, the Toxic Toys were not fit for use by children, but rather, the toys were defective as they contained potentially lethal asbestos.

134.    At all times, New York and the following 48 states, including the District of Columbia, have codified and adopted the provisions the Uniform Commercial Code governing the implied warranty of merchantability: Ala. Code §7-2-314; Alaska Stat. §45.02.314; Ariz. Rev. Stat. Ann. §47-2314; Ark. Code Ann §4-2 314; Cal. Comm. Code §2314; Colo. Rev. St §4-2-314; Conn. Gen. Stat. Ann. §42a-2-314; 6 Del. C. §2-314; D.C. Code §28:2-314; Fla. Stat. Ann §672.314; Ga. Code. Ann. §11-2-314; Haw. Rev. Stat. §490:2-314; Id. Code §28-2-314; Ill. Comp. Stat. Ann. Ch 810, 5/2-314; Ind. Code. Ann. §26-1-2-314; Iowa Code Ann. §554.2314; Kansas Stat. Ann. §84-2-

314; Ky. Rev. Stat. Ann §355.2-314; La. Civ. Code Ann. Art. §2520; 11 Maine Rev. Stat. Ann. §2-314; Md. Code Ann. §2-314; Mass. Gen. Laws. Ch. 106 §2-314; Mich. Comp. Laws Ann. §440.2.314; Minn. Stat. Ann §336.2-314; Miss. Code. Ann. §75-2-314; Missouri Rev. Stat §400.2-314; Mont. Code. Ann §30-2-314; Nev. Rev. Stat. U.C.C §104.2314; N.H. Rev. Ann. §382-A:2-314; N.J. Stat. Ann. §12A:2-314; N.M. Stat. Ann §55-2-314; N.Y. U.C.C. Law 2-314; N.C. Gen. Stat. Ann §25-2-314; N.D. Stat§41-02-314; Ohio Rev. Code Ann §1302.27; Okla. Stat. §2-314; Or. Rev. Stat. §72.3140; Pa. Stat. Ann §2314; R.I. Gen Laws §6A-2-314; S.C. Code Ann. §36-2-314; S.D. Stat. 57A-2-314; Tenn. Code Ann. §47-2-314; Tex. Bus. & Com. Code Ann. §2-314; Ut. Code Ann. §70A-2-314; VA. Code §8.2-314; Vt. Stat. Ann §9A-2-314; W. VA. Code §46-2-314; Wis. Stat. Ann §402.314; and Wyo. Stat. §34.1-2-314.

135.    Further, the Toxic Toys are "goods," as defined in the various states' commercial codes governing the implied warranty of merchantability.

136.    As designers, manufacturers, licensors, producers, marketers, and sellers of toy products, Defendants are "merchants" within the meaning of the various states' commercial codes governing the implied warranty of merchantability.

137.    As merchants of the Toxic Toys, Defendants knew that purchasers relied upon them to design, manufacture, license and sell toy products that were reasonably safe.

138.    Defendants designed, manufactured, licensed and sold Toxic Toys to parents and families of children, and they knew that such Toxic Toys would be used by children.

139.    At the time Defendants designed, manufactured, licensed sold and/or distributed the Toxic Toys, Defendants knew the purpose for which the Toxic Toys were intended and impliedly warranted that the Toxic Toys were of merchantable quality; free of hazardous substances; free of design defects; and safe and fit for their ordinary purpose as play toys and products for children.

140.    Defendants breached their implied warranties in connection with their design, manufacture, license, distribution, and sale of Toxic Toys to Plaintiffs and members of the Class. Indeed, the Toxic Toys were not safe and fit for their ordinary purposes and intended uses and were not free of defects, such as potentially fatal asbestos contamination.

141.    As a direct and proximate result of Defendants breach of implied warranties, Plaintiffs and other members of the Class have been injured and suffered damages, including, but not limited to, exposure to and increased risk of asbestos contamination, the expense of ongoing monitoring and testing for asbestos for each used toy in households, and, if contamination is found or the toy has been discarded, the cost of assessing children and household members for asbestos exposure.

## COUNT III

### Breach of Express Warranty
### (On Behalf of All Plaintiffs Against All Defendants)

142.    Plaintiffs repeat and allege each and every allegation contained above as if fully set forth herein.

143.    The Uniform Commercial Code §2-313 provides that an affirmation of fact or promise, including a description of the goods, becomes part of the basis of the bargain and creates an express warranty that the goods shall conform to the promise and to the description.

144.    Defendants manufactured, licensed, marketed and sold the Toxic Toys and represented that the Toxic Toys were fit for use by children and were free from hazardous substances.    Specifically, defendants represented through labeling on the toy packages and advertising materials on their websites that the products were appropriate for ages 10 and up.    As licensor, CBS retained the rights to review and approve the Toxic Toys including the packaging and consented to the distribution of the Toxic Toys.

- 34 -

145.    Defendants expressly warranted that the Toxic Toys were manufactured to conform with all safety requirements under federal and other applicable laws and regulations, industry-developed standards and product-specific standards.  They also expressly warranted that the Toxic Toys were quality products suitable for use by children as playthings.

146.    Contrary to such representations, Defendants failed to disclose that the Toxic Toys were unsafe as they were potentially contaminated with lethal asbestos.

147.    At all times, New York and the following 48 states, including the District of Columbia, have codified and adopted the provisions the Uniform Commercial Code governing the express warranty of merchantability: Ala. Code 1975 §7-2-313; Alaska Stat §45.02.313; Ariz. Rev. Stat. §47-2313; Ark. Stat. §45.02.313; Cal. Com. Code §2313; Colo. Rev. Stat. Ann. §4-2-313; Conn. Gen. Stat. Ann §4-2-313; 6 Del. C. §2-313; DC. Stat. §28:2-313; Fla. Stat. Ann. §672.314; Ga. Code Ann. §11-2-313; Haw. Rev. Stat. §490:2-313; Id. Code §28-2-313; Ill. Comp. Stat. Ann. Ch 810, 5/2-313; Ind. Code. Ann. §26-1-2-313; Iowa Code Ann. §554.2313; Kansas Stat. Ann. §84-2-313; Ky. Rev. Stat. Ann §355.2-313; 11 Maine Rev. Stat. Ann. §2-313; Md. Code Ann. §2-313; Mass. Gen. Laws. Ch. 106 §2-313; Mich. Comp. Laws Ann. §440.2.313; Minn. Stat. Ann §336.2-313; Miss. Code. Ann. §75-2-313; Missouri Rev. Stat §400.2-313; Mont. Code. Ann §30-2-313; Nev. Rev. Stat. U.C.C §104.2313; N.H. Rev. Ann. §382-A:2-313; N.J. Stat. Ann. §12A:2-313; N.M. Stat. Ann §55-2-313; N.Y. U.C.C. Law 2-313; N.C. Gen. Stat. Ann §25-2-313; N.D. Stat §41-02-313; Ohio Rev. Code Ann §1302.26; Okla. Stat. §2-313; Or. Rev. Stat. §72.3130; Pa. Stat. Ann §2313; R.I. Gen Laws §6A-2-313; S.C. Code Ann. §36-2-313; S.D. Stat. 57A-2-313; Tenn. Code Ann. §47-2-313; Tex. Bus. & Com. Code Ann. §2-313; Ut. Code Ann. §70A-2-313; VA. Code §8.2-313; Vt. Stat. Ann §9A-2-313; Rev. Code. Wash. Ann §62A.2-313; W. VA. Code §46-2-313; Wis. Stat. Ann §402.313; and Wyo. Stat. §34.1-2-313.

148.    At the time that Defendants designed, promoted, manufactured, licensed, sold and/or distributed the Toxic Toys, Defendants knew the purpose for which the Toxic Toys were intended and expressly warranted that the Toxic Toys were safe and fit for use as play toys by children.

149.    Plaintiffs and other members of the Class relied upon the skill, superior knowledge and judgment of the Defendants to sell toys that were reasonably safe for use by children. Plaintiffs could not have known about the risks associated with the Toxic Toys because asbestos is not visible to the human eye, and Defendants failed to warn them about the risk of asbestos contamination in the Toxic Toys.

150.    Defendants breached their express warranties in connection with the sale of the Toxic Toys to Plaintiffs and other members of the Class.

151.    As a direct and proximate result of Defendants breach of express warranties, Plaintiffs and other members of the Class have suffered damages, including, but not limited to, the purchase price and/or value of the Toxic Toys, the exposure to and increased risk of asbestos contamination, the cost of asbestos testing for each used toy in households, and, if contamination is found or the toy has been discarded, the expense of ongoing monitoring and testing for assessing children and household members for asbestos exposure.

## COUNT IV

### Strict Liability – Design Defect/Manufacturing Defect or Failure to Warn
### (On Behalf of All Plaintiffs Against All Defendants)

152.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

153.    Defendants designed, manufactured, licensed, promoted, sold and/or distributed Toxic Toys to parents of children.

- 36 -

154.    The Toxic Toys that Defendants designed, manufactured, licensed, promoted, sold and/or distributed were defective in their design and/or manufacturing due to inadequate inspection and testing, inadequate warning, and inadequate reporting regarding the results of quality-control testing and safety inspections, or the lack thereof. Further, the Toxic Toys were defective when they left the control of the Defendants such that: (a) the foreseeable risks of asbestos contamination exceeded the benefits associated with the design or manufacturing as they were; (b) they were unreasonably dangerous – more dangerous than an ordinary consumer would expect, and more dangerous than other toys.

155.    Defendants' toys were expected to and did reach Plaintiffs and other members of the Class without substantial change in condition.

156.    Defendants knew or should have known that the Toxic Toys contained a non-obvious danger in that some of the fingerprinting powder contained therein was contaminated by asbestos, which is not detectable by sight or smell. Moreover, the presence of asbestos was a knowable danger.

157.    Defendants knew that Plaintiffs and the Class would use the products without first inspecting them for asbestos. However, Defendants failed to inform Plaintiffs and members of the Class as to the danger that they contained asbestos, or of the adverse health effects that the Toxic Toys could have on children.

158.    Had Plaintiffs and members of the Class been warned about the risk that the Toys contained asbestos and/or the possibly fatal adverse health effects that the asbestos contamination could have on their children and bystanders, they would not have purchased or acquired the Toxic Toys.

159.    The Toxic Toys that Defendants designed, manufactured, licensed, sold and/or distributed were defective due to inadequate inspection and testing, inadequate warning and, inadequate reporting regarding the results of quality-control testing and safety inspections, or lack thereof. As a direct and proximate result of the defective condition of the Toxic Toys as designed, manufactured, licensed, promoted, sold and/or distributed by Defendants, and due to the failure of Defendants to warn consumers of same, Plaintiffs and other members of the Class have suffered damages including, but not limited to, the value of the Toxic Toys, the expense of asbestos testing for each toy in the household, and, if contamination is found or the toy has been discarded, the expense of assessing children and household members for asbestos exposure and their increased risk of adverse health effects.

160.    Plaintiffs do not allege strict liability claims based on an injury to the Toxic Toys themselves; Plaintiffs' strict liability claims relate to injuries that they and Class members sustained as a result of the Toxic Toys.

### COUNT V

**Violations of Section 349 of New York General Business Law:
Deceptive Acts and Practices
(On Behalf of New York Purchasers Against All Defendants)**

161.    Plaintiff Antalek repeats and realleges each and every allegation contained above as if fully set forth herein.

162.    Defendants' acts and practices as detailed herein constitute acts of deceptive practices under GBL § 349.

163.    Defendants' misleading and deceptive business practices adversely impacted a class of New York purchasers, and therefore, constitute consumer-oriented conduct under GBL § 349, which resulted in a direct harm to the New York purchasers. Defendants' conduct has adversely impacted, and continues to adversely impact, New York purchasers of Defendants' products, by

- 38 -

*inter alia*, designing, manufacturing, licensing, selling, marketing and distributing the Toxic Toys to New York consumers and exposing them to the harmful effects of asbestos.

164.    Defendants engaged in misleading business practices under GBL § 349. By engaging in the above-described conduct, Defendants engaged in misleading business acts or practices in that their conduct had a tendency and likelihood to deceive persons to whom such conduct was and is targeted by designing, manufacturing, licensing, selling, marketing and distributing the Toxic Toys as safe, quality, and age appropriate products for children when in fact the Toxic Toys contained fingerprinting powder that tested positive for deadly asbestos contamination.

165.    Plaintiff Antalek and a class of New York purchasers were deceived by Defendants' representations that the products were safe and suitable for use as playthings for children. Plaintiff Antalek and a class of New York purchasers reasonably relied on Defendants' assurances that the Toxic Toys are safe and quality products and Plaintiff Antalek and other members of the class of New York purchasers suffered an injury as a direct result of Defendants' misleading business. Plaintiff Antalek and a class of New York purchasers would not have purchased the Toxic Toys had they known of the risk of asbestos contamination.

166.    The deceptive acts and practices of Defendants have directly, foreseeably and proximately caused damages and injury to Plaintiff Antalek and the other members of the class of New York Purchasers. As a result of the Toxic Toys, Plaintiff Antalek and New York purchasers have purchased products that are not fit for their ordinary use as playthings, suffered an increased risk of serious health problems, and incurred the cost of asbestos testing of the toy and medical assessment of asbestos exposure.

167.    Pursuant to GBL § 349, Plaintiff Antalek, on her own behalf and on behalf of a class of New York purchasers, seeks an order enjoining Defendants from such future conduct and any

such other orders that maybe necessary to rectify the misleading and deceptive business practices of Defendants, including the appointment of a receiver, restoring to any person in interest any money paid for the Toxic Toys, the cost of assessment for Plaintiff and Antalek members of the class of New York purchasers who have been exposed to the Toxic Toys, and reasonable monitoring and appropriate treatment for those who are positively identified as exposed to asbestos.

## COUNT VI

### Fraudulent Concealment
### (On Behalf of All Plaintiffs Against All Defendants)

168.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

169.    As alleged herein, on or about *January 1, 2008*, Planet Toys posted on their website a statement that a kit that was tested did not contain asbestos.  At the time this representation was made, Planet Toys knew the true facts regarding the defect in its CSI kit, as detailed above, and knew of the potential ramifications of disclosing the defect to Plaintiffs and Class members, but failed and/or refused to do so, fraudulently concealing the true facts.

170.    Planet Toys' willful concealment and failures to disclose were made with the intent to induce Plaintiffs' and the other Class members' justifiable reliance, and in fact did so, as evidenced by their purchase of the CSI kit.  In the alternative, reliance on the part of the Plaintiffs and other members of the Class can be properly presumed.

171.    Plaintiffs and other members of the Class, unaware of Defendants' concealment or suppression of said material facts, purchased the CSI kit, reasonably relying on the misleading representations and omissions of the Company.  Plaintiffs and other members of the Class could not have discovered, in the exercise of reasonable diligence, Planet Toys' fraud and failures to disclose.

Had Plaintiffs and the other members of the Class known of the concealed facts, they would not have purchased the CSI kit.

172.    As a proximate result of the foregoing acts and omissions, Plaintiffs and the other members of the Class have suffered damages.

## COUNT VII

### Unlawful, Unfair or Fraudulent Business Acts and Practices in Violation of Cal. Bus. & Professions Code §17200, *et. seq.* (On Behalf of California Plaintiffs Against All Defendants)

173.    Plaintiff Kick repeats and realleges each and every allegation contained above as if fully set forth herein.

174.    Defendants' acts and practices as detailed herein constitute acts of unfair competition. Defendants have engaged in an unlawful, unfair or fraudulent business act and/or practice within the meaning of Cal. Bus. & Prof. Code §17200 *et seq.* Defendants need only violate one of the three prongs to be held strictly liable.

175.    Defendants have engaged in "unlawful" business acts and practices by designing, manufacturing, licensing, promoting, selling and/or distributing the Toxic Toys and representing them as safe and quality products when, in fact, the Toxic Toys contained fingerprinting powder that tested positive for a deadly form of asbestos.

176.    Defendants' business acts and practices violated numerous provisions of federal law, including, *inter alia*, the FHSA, 15 U.S.C. §1263(a). Defendants' practices also violated other provisions under state law and common law, including, *inter alia*, Cal. Health & Safety Code §25249.5 *et seq.*; *Restatement (Third) of Torts: Prod. Liab.* §1 (1998). Plaintiffs reserve the right to identify additional provisions of the law violated by Defendants as further investigation and discovery warrants.

- 41 -

177.    Defendants' failure to comply with the above statutes, regulations and common law constitutes an unlawful business act or practice.

178.    California Bus. & Prof. Code §17200 also prohibits any "unfair business act or practice." As described above, Defendants also engaged in "unfair" business acts and/or practices by needlessly subjecting Plaintiff Kick and the Class to the risk of deadly asbestos exposure without any warning. The unfairness of Defendants' actions outweighs any business justification, motive or reason therefore, particularly considering the available legal alternatives that exist in the marketplace. Further, their actions are immoral, unethical, unscrupulous, offends established public policy, and has injured Plaintiff Kick and other members of the Class as described herein.

179.    Section 17200 also prohibits any "fraudulent business act or practice." By engaging in the above-described conduct, Defendants engaged in "fraudulent" business acts or practices in that their conduct had a tendency and likelihood to deceive persons to whom such conduct was and is targeted by designing, manufacturing, licensing, selling, marketing and distributing the Toxic Toys as safe, quality, and age appropriate products for children when in fact the Toxic Toys contained fingerprinting powder that tested positive for deadly asbestos contamination.

180.    Plaintiff Kick and members of the Class were deceived by Defendants' representations that the products were safe and suitable for use as playthings for children. Plaintiff Kick and the Class reasonably relied on Defendants' assurances that the Toxic Toys are safe and quality products and Plaintiff Kick and members of the Class suffered an injury as a direct result of the unlawful, unfair, and fraudulent business practices of Defendants. Plaintiff Kick and members of the Class would not have purchased the Toxic Toys had they known of the risk of asbestos contamination.

181.    California Bus. & Prof. Code §17200 also prohibits any "unfair, deceptive, untrue or misleading advertising." For the reasons discussed above, Defendants have engaged in unfair, deceptive, untrue and misleading advertising in violation of §17200.

182.    As a direct and proximate result of Defendants' misrepresentations regarding the safety of the Toxic Toys, Plaintiff Kick and members of the Class have suffered injury. Specifically, as a result of Toxic Toys, Plaintiff Kick and members of the Class have purchased products that are not fit for their ordinary use as playthings, suffered an increased risk of serious health problems, and incurred the cost of asbestos testing of the toy and medical assessment of asbestos exposure.

183.    Pursuant to Cal. Bus. & Prof. Code §17203, Plaintiff Kick, on his own behalf and on behalf of a class of California purchasers seeks an order enjoining Defendants from such future conduct and any such other orders that maybe necessary to rectify the unlawful, unfair, and fraudulent business practices of Defendants, including the appointment of a receiver, restoring to any person in interest any money paid for the Toxic Toys, the cost of assessment for Plaintiff Kick and Class Members who have been exposed to the Toxic Toys, and reasonable monitoring and appropriate treatment for those who are positively identified as exposed to asbestos.

## COUNT VIII

### Violation of the California Consumers Legal Remedies Act, Cal. Civ. Code §1750, *et. seq.*, and Similar Consumer Protection Statutes of Other States (On Behalf of California Plaintiffs Against All Defendants)

184.    Plaintiff Kick repeats and realleges each and every allegation contained above as if fully set forth herein.

185.    The California Consumers Legal Remedies Act, Cal. Civ. Code §1750 *et seq.*, protects consumers against fraud, unlawful practices, and unconscionable commercial practices in connection with the sale of any merchandise.

- 43 -

186.    Plaintiff Kick is a "consumer" as defined by Cal. Civ. Code §1761(d).

187.    The Toxic Toys are "goods" within the meaning of Cal. Civ. Code §1761(a).

188.    Defendants manufactured, licensed, distributed, sold and falsely marketed the Toxic Toys as safe and quality products, when in fact they contained fingerprinting powder that tested positive for asbestos, which is a hazardous substance under federal law and constitutes a violation of the California Consumers Legal Remedies Act, as well as other similar state statutes, including, but not limited to: Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1-12; New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§56:8 *et seq.;* and Arkansas Deceptive Trade Practices Act, Ark. Stat. §4-88-101 *et seq.*

189.    Defendants violated and continue to violate the Consumer Legal Remedies Act by engaging in the following practices proscribed by Cal. Civ. Code §1770(a) in transactions with Plaintiff Kick and the Class, which were intended to result in, and did result in, the sale of the Toxic Toys:

(5)    Representing that [the Toxic Toys have] . . . characteristics . . . uses [or] benefits . . . which they do not have . . .

*        *        *

(7)    Representing that [the Toxic Toys] are of a particular standard, quality or grade . . . if they are of another.

*        *        *

(9)    Advertising goods . . . with intent not to sell them as advertised.

*        *        *

(16)    Representing that [the Toxic Toys have] been supplied in accordance with a previous representation when [they have] not.

190.    Plaintiff Kick and other members of the Class reasonably relied upon Defendants' representations that the Toxic Toys were safe as toys for children.

191.    Plaintiff Kick and other members of the Class were deceived by Defendants' representations that the Toxic Toys were safe and quality toys, when instead the Toxic Toys contained fingerprinting powder that tested positive for tremolite asbestos and thereby may have exposed children who played with them, and other bystanders, to the deadly substance. Plaintiff and other Class members would not have purchased and/or acquired the Toxic Toys had they know that the Toxic Toys might contain deadly asbestos.

192.    In addition, the Retailer Defendants and CBS adopted, and are responsible for, the representations that Planet Toys made on its packaging regarding the safety of the toys and regarding the age appropriateness of the toys, when it decided to sell such toys on its store shelves and websites.

193.    As a direct and proximate result of Defendants' misrepresentations and unlawful and unconscionable commercial practices, Plaintiff Kick and members of the Class, have been injured and suffered damages in that they have purchased products they cannot use, they have suffered an increase risk of serious health problems, incurred the expense of testing and medical assessment to determine whether they may contract a fatal lung disease later in life.

194.    Pursuant to §1782 of the California Consumers Legal Remedies Act, Plaintiff notified Defendants in writing by certified mail of the particular violations of §1770 of the Act and demanded that they rectify the problems associated with the actions detailed above and give notice to all affected consumers of their intent to so act. As 30 days have elapsed since Plaintiff provided such notice, Plaintiff and California Resident plaintiffs are entitled to damages under the Consumer Legal Remedies Act, California Civil Code §1784.

195.    In addition to damages, pursuant to Cal. Civ. Code §1782(d), Plaintiff Kick, on behalf of himself and a class of California purchasers seek a Court order enjoining the above-described wrongful acts and practices of the CBS and for restitution and disgorgement.

## COUNT IX

**Violation of the Song-Beverly Consumer Warranty Act for Breach of Implied Warranty of Merchantability, Cal. Civ. Code §§1792 & 1791.1(a) (On Behalf of California Plaintiffs Against All Defendants)**

196.    Plaintiff Kick repeats and realleges each and every allegation contained above as if fully set forth herein.

197.    Plaintiff Kick is a "buyer" within the meaning of Cal. Civ. Code §1791.

198.    The Toys are "consumer goods" within the meaning of Cal. Civ. Code §1791.

199.    The Manufacturer Defendants are "manufacturers" of the Toxic Toys within the meaning of Cal. Civ. Code §1791(j).

200.    CBS and Hammacher are "retailers" of the Toxic Toys within the meaning of Cal. Civ. Code §1791(l).

201.    Defendants impliedly warranted to Plaintiff Kick and the Class that the Toxic Toys were "merchantable" within the meaning of Cal. Civ. Code §§1791.1(a) and 1792.

202.    Defendants have breached the implied warranty of merchantability to Plaintiff and members of the Class because the Toxic Toys:  (i) would not pass without objection in the trade; (ii) were not fit for their ordinary purposes for which such goods are used; (iii) were not adequately contained, packaged and labeled; and (iv) did not conform to the promises or affirmations of fact made on the container or label.

203.    As a proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiff and members of the Class sustained damages including, but not limited to, the purchase price of the Toxic Toys due to the risk of asbestos; the expense of testing each Toy in

the household, and if asbestos is found or the Toy has been discarded, the cost of assessing children and household members for asbestos exposure; and for increased risk of contracting deadly diseases later in life.

204.    Pursuant to Cal. Civ. Code §§1791.1(d) and 1794(a), Plaintiff Kick, on behalf of himself and a class of California residents are entitled to damages and other legal and equitable relief including, at their election, the right of reimbursement.

### COUNT X

**Violation of the Song-Beverly Consumer Warranty Act for Breach of
Implied Warranty of Fitness, Cal. Civ. Code §§1792.1 & 1791.1(b)
(On Behalf of California Plaintiffs Against the Manufacturer Defendants)**

205.    Plaintiff Kick repeats and realleges each and every allegation contained above as if fully set forth herein.

206.    The Manufacturer Defendants impliedly warranted to Plaintiff Kick and members of the Class that the Toxic Toys were fit for the particular purpose of being played with by children within the meaning of Cal. Civ. Code §§1791.1(b) and 1792.1.

207.    The Manufacturer Defendants knew or had reason to know that the Toxic Toys were being purchased by Plaintiff and members of the Class for use by children as playthings, and that the buyers of the Toxic Toys were relying on their skill and judgment to furnish goods suitable for that purpose.

208.    The Manufacturer Defendants have breached the implied warranty of fitness.

209.    As a proximate result of the Manufacturer Defendants' breach of the implied warranty of fitness, Plaintiff and the Class sustained damages including, but not limited to, the purchase price of the Toxic Toys, the expense of assessment for asbestos exposure, and risk of increased adverse health effects.

210.    Pursuant to Cal. Civ. Code §§1791.1(d) and 1794(a), Plaintiff Kick, on behalf of himself and a class of California residents are entitled to damages and other legal and equitable relief including, at their election, the right of reimbursement.

## COUNT XI

### Violation of the Song-Beverly Consumer Warranty Act for Breach of Implied Warranty of Fitness, Cal. Civ. Code §§1792.2 & 1791.1(b) (On Behalf of California Plaintiffs Against CBS and the Retailer Defendants)

211.    Plaintiff Kick repeats and realleges each and every allegation contained above as if fully set forth herein.

212.    CBS and the Retailer Defendants impliedly warranted to Plaintiff Kick and members of the Class that the Toxic Toys were fit for the particular purpose of being played with by children within the meaning of Cal. Civ. Code §§1791.1(b) and 1792.2.

213.    CBS and the Retailer Defendants knew or had reason to know that the Toxic Toys were being purchased by Plaintiff and the Class for the particular use as children's playthings, and that the buyers of the Toxic Toys were relying on their skill and judgment to furnish goods suitable for that purpose.

214.    CBS and the Retailer Defendants have breached the implied warranty of fitness.

215.    As a proximate result of CBS and the Retailer Defendants' breach of the implied warranty of fitness, Plaintiff and members of the Class sustained damages including, but not limited to, the purchase price of the Toxic Toys, the cost of assessment for asbestos exposure, and risk of increased adverse health effects.

216.    Pursuant to Cal. Civ. Code §§1791.1(d) and 1794(a), Plaintiff Kick, on behalf of himself and a class of California residents are entitled to damages and other legal and equitable relief including, at their election, the right of reimbursement.

## COUNT XII

### Unjust Enrichment
### (On Behalf of Plaintiffs Against All Defendants)

217.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

218.    At all times relevant hereto, Defendants designed, manufactured, licensed, produced, promoted, marketed and/or sold Toxic Toys containing fingerprinting powder laden with deadly tremolite asbestos.

219.    Plaintiffs and members of the Class conferred upon Defendants non-gratuitous payments for Toys that may expose their children to asbestos, which can be fatal. Defendants accepted or retained the non-gratuitous benefits conferred by Plaintiffs and members of the Class, with full knowledge and awareness that, as a result of Defendants' unconscionable wrongdoing, Plaintiffs and members of the Class were not receiving products of the quality, nature, fitness or value that had been represented by Defendants and reasonable consumers would have expected.

220.    Retaining the non-gratuitous benefits conferred upon Defendants by Plaintiffs and members of the Class under these circumstances made Defendants' retention of the non-gratuitous benefits unjust and inequitable.

221.    Because Defendants' retention of the non-gratuitous benefits conferred by Plaintiffs and members of the Class is unjust and inequitable, Plaintiffs and members of the Class are entitled to, and hereby seek disgorgement and restitution of Defendants' wrongful profits, revenue, and benefits in a manner established by the Court.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Class, prays for judgment against Defendants as follows:

- 49 -

A.    Certifying this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the proposed class described herein and designating Plaintiffs' Counsel as Lead Counsel for the Class;

B.    Awarding declaratory and injunctive relief as permitted by law or equity pursuant to Rules 64 and 65 of the Federal Rules of Civil Procedure to assure that the Class has an effective remedy, including, but not limited to:

1.    Enjoining Defendants from continuing the unlawful practices as set forth herein;

2.    Awarding damages as supplemental relief;

3.    Ordering Defendants to engage in a corrective advertising campaign;

4.    Ordering Defendants to implement a program to dispose of all affected products that will minimize the risk of future public safety hazards, and publicizing the same;

5.    Ordering Defendants to develop improved quality control measures to ensure consumer safety; and

6.    Directing Defendants to identify, with Court supervision, victims of their conduct and pay them restitution and disgorgement of all monies acquired by Defendants by means of any act or practice declared by this Court to be wrongful;

C.    Awarding costs of testing of used Toxic Toys and an initial medical assessment to detect possible injury to Plaintiffs and members of the Class;

D.    Awarding the cost of safely disposing of the Toxic Toys;

E.    Awarding the cost of reasonable monitoring and appropriate treatment for those Class members who are identified as persons exposed to asbestos;

F.      Awarding reimbursement to Class members for the amounts they paid for the Toxic

Toys;

G.      Awarding any statutory and/or punitive damages as to counts for which they are

available under applicable law and in such amounts as the Court deems just and proper;

H.      Awarding all costs, including experts' fees and attorneys' fees and expenses, and the

costs of prosecuting this action; and

I.      Awarding such other relief as the Court deems just and proper.

### JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues so triable.

DATED:  May 28, 2008

WHATLEY DRAKE & KALLAS, LLC
JOE R. WHATLEY, JR.  (JW 1222)
EDITH M. KALLAS (EK 0841)
JOSEPH P. GUGLIELMO (JG 2447)
ELIZABETH ROSENBERG (ER 5370)
1540 Broadway, 37th Floor
New York, NY  10036
Telephone:  212/447-7070
212/447-7077 (fax)


AUDET & PARTNERS, LLP
WILLIAM M. AUDET
221 Main Street, Suite 1460
San Francisco, CA  94105
Telephone:  415/568-2555
415/568-2556 (fax)
waudet@audetlaw.com

KAMBEREDLSON, LLC
SCOTT A. KAMBLER (SK 5794)
DANA B. RUBIN (DR 8451)
11 Broadway, 22nd Floor
New York, New York, 10004
Telephone: (212)/920-3072
212/202-6364 (Fax)

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
JOHN J. STOIA, JR.
RACHEL L. JENSEN
PHONG TRAN
THOMAS J. O'REARDON II
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)


GOLDENBERG HELLER ANTOGNOLI
  ROWLAND SHORT & GORI, P.C.
RANDY L. GORI
2227 South State Route 157
Edwardsville, IL  62025
Telephone:  618/656-5150
618/656-8169 (fax)
randy@ghalaw.com

GLASSMAN, EDWARDS, WADE &
  WYATT, P.C.
B.J. WADE
26 N. Second Street
Memphis, TN  38103
Telephone:  901/527-4673
901/521-0940 (fax)

*Attorneys for Plaintiffs*